UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER: 05-CV-10457 EFH

MICHAEL HENDRICKS, JR.

V.

BOSTON FIRE DEPARTMENT,
CHIEF JOSEPH FINN, AND
CITY OF BOSTON

PLAINTIFF'S MEMORANDUM OF LAW ON OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1. INTRODUCTION

Plaintiff opposes the Defendants' Motion for Summary Judgment on all counts of the Plaintiff's Complaint for race and disability discrimination under the Americans with Disabilities Act (ADA) and M.G.L.c. 151B. Plaintiff incorporates by reference the facts in Plaintiff's Rule 56.1 Statement of Facts. Plaintiff filed a timely discrimination claim with the Massachusetts Commission Against Discrimination.

Plaintiff opposes Defendants' alternative grounds in that Plaintiff can prove that Boston Fire Department promised to rehire him as soon as conditions precedent were met and that he relied upon these promises in the actions Plaintiff subsequently engaged in. Defendants are claiming that because they did not articulate any reason for not re-hiring Plaintiff in 2002, the Plaintiff can not prove that the reason that Plaintiff was not re-hired was discriminatory after that date. Defendants also appear to conclude that because Boston Fire Department never responded to Plaintiff's Request for Reinstatement in 2005, that he can not use this lack of response as a discriminatory action (or, in this case, inaction).

2.   BACKGROUND

Plaintiff was a Boston firefighter from October 29, 1997 until March 24, 2000. He worked at the same fire station, Engine 29 in Brighton, the entire time he was a firefighter. During his entire tenure at Boston Fire Department, Hendricks was never disciplined until his mental disease began to manifest itself.

On January 5, 2000, Hendricks was moving a refrigerator at the Stationhouse with another Firefighter, Marc Capehart. During the process, the refrigerator fell upon him while the two were on the stairs. Capehart reported the fall to the immediate supervisor that was on duty that day. Plaintiff was sent to St. Elizabeth's Hospital by the supervisor. The physician at St. Elizabeth's

Hospital recommended two days off work. Boston Fire Department did not question that the accident occurred (SOF ¶ 1).

On February 29, 2000, Dr. Hamrock of the Boston Fire Department, recorded Plaintiff appeared "somewhat paranoid and overly concerned about his car registration being transferred to his new car without his knowing about it." At that time, Dr. Hamrock diagnosed Plaintiff as having "bipolar disorder versus schizophrenia versus drug use." (SOF ¶ 2). Plaintiff tested positive for marijuana use at this time. At this time, Boston Fire Department was on notice that Plaintiff was suffering from some type of disability. He was hospitalized at this time at Arbour Hospital for ten days.

On March 3, 2000, Dr. Hamrock called Plaintiff after Plaintiff left without being seen. In addition, he discussed his "concern about a psychic illness bipolar disorder versus schizophrenia as well as drug use or medical condition." (SOF ¶ 3) with Plaintiff's father. It is evidence that although Boston Fire Department was not sure of Plaintiff's medical condition, it knew that Plaintiff had a serious medical condition.

On March 6, 2000, Dr. Hamrock called Harvard Community Health Plan and discussed Plaintiff's "health and recent behavior and will need full psych eval and possible meds for ? diagnosis bipolar disorder versus schizophrenia versus drug use." (SOF ¶ 13). At this point, it is obvious that Hamrock again entertained the possibility of a mental illness for the Plaintiff. Plaintiff was on medical leave at this time, and was to return in one month (SOF ¶ 14).

On March 23, 2000, Plaintiff again had an appointment with Dr. Hamrock, which he missed. (SOF ¶ 16).

On March 24, 2000, Plaintiff tendered his resignation. Boston Fire Department knew that Plaintiff was suffering from an illness which made his resignation involuntary. (SOF ¶ 17).

Plaintiff was committed to the Lindermann Mental Health Center in May 2000 and was taking court ordered antipsychotic medications. Plaintiff responded well to these medications. (SOF ¶ 18).

On November 13, 2000, Dr. John Greene, a consultant with Boston Fire Department filed a report, outlining Plaintiff's illness to date, and noting that Plaintiff had schizophrenia. Dr. Greene's report, sent to Boston Fire Department, did not recommend reinstatement. (SOF ¶ 19).

On April 19, 2002, Plaintiff requested reinstatement in writing, which was denied. Boston Fire Department did not request any medical information nor did it request a medical evaluation. Plaintiff then contacted Personnel, in order to determine what, if anything, he could do to be reinstated. At no time did Boston Fire Department inform Plaintiff that he would never be reinstated. If it had done so, Plaintiff's subsequent actions would have been different. (SOF ¶ 20).

Plaintiff was last hospitalized in early 2003, several years ago. (SOF ¶ 3 and 21).

In March 2003, Plaintiff hired Paul Hajjar, an attorney, to assist him in his return to Boston Fire Department. Hajjar discussed the situation with members of Boston Fire Department, including Defendant Finn and others by telephone. Hajjar notes that although Finn would state he would return phone calls, he never

did. Hajjar instigated all phone calls and Hajjar would make numerous attempts before reaching Finn. His first conversation with Finn was around March 25, 2003(SOF ¶ 24). At that time, Hajjar discussed what Plaintiff needed to do before requesting reinstatement. (SOF ¶ 25). At no time did Finn ever tell Hajjar or Plaintiff that Plaintiff would not be reinstated. Finn stated that Plaintiff needed to contact William Ostigui of the EAP (Employee Assistance Program) to undergo a drug rehabilitation program. (SOF ¶ 26). The EAP is an employee only program; yet, Plaintiff was encouraged and allowed to attend. Based upon Finn's direction, Plaintiff enrolled in and attended the fire-department-employees-only substance abuse program. (SOF ¶ 27).

On July 23, 2003, Hajjar sent Commissioner Christian a written request for reinstatement of the Plaintiff. (SOF ¶ 28). Hajjar never received a written response to this communication. When he followed up with a phone call to the Commissioner's office, he was told that "Finn handled that area." (SOF ¶ 29). Hajjar enclosed a letter from Ostigui indicating Plaintiff's participation in the EAP. (SOF ¶ 30).

On November 11, 2003, Hajjar again discussed the reinstatement matter with Finn, only to be told that Finn's hand were tied temporarily due to budget constraints and the status of the Consent Decree. (SOF ¶ 30). At that time, Finn stated that he had a budget meeting and would contact Hajjar before January 1, 2004 (SOF ¶ pg 32). At no time during this conversation did Finn state that Boston Fire Department would not rehire Plaintiff; instead, he was encouraging in Plaintiff's efforts to be rehired.

At this point, Dr. Querques states that Plaintiff has been medication compliant, and that as long as Plaintiff is medication compliant, he will demonstrate the ability to perform his job without any adverse repercussions to either the Plaintiff or the Defendants. Plaintiff has recovered as long as he is taking his medication. (SOF ¶ 33). As Plaintiff has recovered, so long as he is taking his medication, he is no longer "disabled;" however, Defendants perceive him as having a continuing disability.

On January 7, 2004, Finn told Hajjar to call back in one month to see if funding was available. (SOF ¶ pg 34). When Hajjar pointed out that Boston Fire Department was advertising in the newspaper for new hires, Finn stated that the ad was solely for the purpose of the Civil Service Exam but that Boston Fire Department was not hiring yet.

On March 3, 2004, Hajjar again reached Finn by telephone. Finn now stated that Plaintiff needed to see Boston Fire Department's psychiatrist before he could be reinstated. Prior to this conversation, Finn had stated that he needed a letter from Plaintiff's psychiatrist and several references, all of which had been provided to Finn. (SOF ¶ 35). At no time prior to March 3, 2004 did Finn ever state that he required a psychiatric evaluation or the references provided were inadequate.

Hajjar believes to believe that the Boston Fire Department has no intention of reinstating plaintiff. (SOF ¶ 36).

On March 31, 2004, one year after Hajjar began his efforts to get Plaintiff reinstated, and one year after his first contact with Finn, Hajjar, Plaintiff and Finn

had a second meeting. At this meeting, Finn stated that Plaintiff should reenter the EAP (which he had already done), that when Finn had money in the budget to reinstate the Plaintiff he would so inform Hajjar, and then he would have Plaintiff evaluated by the department physician. (SOF ¶ 37). Hajjar reports that Finn, for the first time, appeared to be more concerned with Plaintiff's mental status, even though all evidence available demonstrated that Plaintiff's mental status was fine, than the budget which had been the greatest concern up to this time. (SOF ¶ 38). Hajjar is not sure but he believes that the Consent Decree had been overturned by this time. (SOF ¶ 39).

Hajjar reports that during the one year that he remained in contact with Finn, until after the March 2004 meeting, the conversations all indicated that Finn would reinstate Plaintiff if Boston Fire Department could comply with the consent decree, have money in the budget, and Plaintiff was cleared by the department psychologist. At the end of this year, Hajjar realized that Finn was not taking any action to reinstate Plaintiff, even though Plaintiff had been actively following Finn's directives to be reinstated. (SOF ¶ 40).

In April 2004, Hajjar assisted Plaintiff in drafting another request for reinstatement. This request has never been responded to. (SOF ¶ 41).

The conversations between Hajjar and Finn entailed what Plaintiff needed to do to be reinstated by Boston Fire Department. No one, other the Finn, could make any representations regarding the plaintiff; the conversations with others were only able to provide general information.

In retrospect, Plaintiff's disease caused him to take what he perceived as actions designed to help him, but which were in fact the direct result of his paranoia, and thus his disability. As one such action, he claimed that his previously proven accident at work did not occur. Boston Fire Department knew that this accident had occurred and that the plaintiff had been injured as it had already investigated the incident. Another example is that the Plaintiff believed, due to his paranoia, that someone was setting him up to "take the fall" as a drug dealer, and the Boston Fire Department employees were assisting in setting him up. Not wanting to spend years in prison, Plaintiff believed that if he confessed to being a drug abuser, no one would be able to set him up as a drug dealer. Also, in his delusional state, Plaintiff resigned from the Boston Fire Department, believing that his action would prevent anyone form successfully prosecuting him as a drug dealer. Of interest is that Boston Fire Department company doctor knew that Plaintiff was suffering from a mental illness at this time, and advised him not to take said action. Plaintiff was obviously not competent to make such a decision yet Boston Fire Department accepted his resignation, even knowing that he was not competent make such a decision. At no time did Boston Fire Department assist the Plaintiff in obtaining the medical treatment he needed. After his resignation, Plaintiff became worse, and hospitalized. The treatment times have been designated in the Defendant's brief and are not disputed. Plaintiff's reason behind his subsequent actions is not as stated.

Plaintiff was unfamiliar with the treatment of schizophrenia. He was a strong believer in personal strength being able to overcome limitations and wrongfully believed that strength of character could overcome the need for

medication. After his release from the hospital, he believed that he could handle his illness without medication. As is apparent from the record, he soon learned that he could not do so. Again, after his hospitalization, he tried to do the same again. After this hospitalization, he realized that schizophrenia is not a disease that can be conquered by strength of mind and realized that he will, indeed, require medication for the remainder of his life in order to control his disease. He has been medication compliant ever since that time, as can be demonstrated by his psychiatrist's records and evaluations.

Once he realized that he would require medication for the remainder of his life, and actively participated in taking it, Plaintiff tried to return to the Boston Fire Department. He requested reinstatement, but was denied with no reason. Because Boston Fire Department knew of his disability which had become apparent before he resigned, and knew that his disability would have had an impact on his behavior, and willingness to claim problems that did not exist, Hendricks reasonably assumed that either Boston Fire Department had not reviewed his entire record, had not determined that with medication he was able to perform all the duties of his job or was being discriminatory against him due to his race and/or disability.

Knowing that under Massachusetts General Laws, he only had five years from his resignation date until he could no longer be reinstated, Hendricks contacted an attorney to assist him in attempting to return to work. Paul Hajjar, Esq., began working with Chief Finn. Chief Finn proceeded to state that if Plaintiff took certain actions, and certain action precedent occurred, Deputy Chief Finn has stated that he made all rehiring decisions and that Chief Christian would consult with Finn and make his decision based upon Finn's recommendation. If Finn had stated that Plaintiff was a good candidate for rehire, Christian would have rehired him. If Finn stated that Plaintiff should not be rehired, Christian would follow that recommendation.

After Hajjar had been working with Finn for approximately one year (April 2004), Plaintiff again took the affirmative action of reapply for reinstatement as a fire fighter. Boston Fire Department never responded to this request. Based upon the actions of Plaintiff and Hajjar, the last discriminatory action of the Boston Fire Department took place, not in 2002 when the Department sent Plaintiff a letter refusing to reinstate him, but in 2004, after Plaintiff realized that he was not going to be reinstated no matter what actions he took on the advice of Finn.

Finn has therefore caused Plaintiff to undergo excessive participation in programs that Plaintiff would not have engaged in, and did not need, solely to satisfy Finn's recommendations.

On all telephone contacts between Hajjar and Finn, Finn stated that Plaintiff would be rehired as soon as conditions precedent were met. These conditions included Plaintiff's participation in a drug rehab program, the status of the Consent Decree, and funding. Finn later added that Plaintiff would need to be evaluated by Boston Fire Department's physician, although Finn never made recommendations on what findings needed to be met. All conditions precedent

were met, with the exception of the latter. Plaintiff participated in the drug program, even though his physician stated that the only reason that Plaintiff had been sporadically using marijuana was to control his then undiagnosed schizophrenia and that Plaintiff had no drug problem. The consent decree was overturned and all white firefighters that were required to be hired had been hired, and Boston Fire Department had been awarded sufficient funding to hire additional firefighters, which meant that Plaintiff was in a position to be rehired. The only condition precedent not met was that of the medical examination, as, prior to such an examination taking place, Finn stated that Plaintiff would not be rehired.

      Due to state law, Plaintiff needed to be rehired within 5 years of his resignation. When he approached Finn after his disease was stabilized, and he was no longer symptomatic and had not been symptomatic for a prolonged period of time, his physician stated that he would be able to return to work, he was approximately 4 years into that five year period. If his request for reinstatement could be postponed for one more year, Boston Fire Department would be able to sate that it could not hire Plaintiff due to the five year law. This would take the onus off of Boston Fire Department and put it on Plaintiff. By following Finn's recommendations, Plaintiff was required to participate in a drug program that was expected to last one year (according to the contract, which Plaintiff had not signed when he enrolled in the program. Plaintiff had attended 4 - 6 months at the time of this meeting); then expected to wait while fire fighters affected by the consent decree were rehired, then expected to wait for budget. In fact, plaintiff did the drug rehabilitation program, even though it was not necessary; all fire fighters affected were hired; and Boston Fire Department was advertising for candidates, which demonstrates that it had the funds available to hire. At no time were either of the last two facts relayed to the Plaintiff, further demonstrating that Finn was not in good faith providing information to the Plaintiff, information which Plaintiff would have used to push harder for reinstatement.

      Plaintiff relied upon the promises of Finn, the only person who could reinstate him as a fire fighter. Finn continually told Plaintiff what he needed to do prior to be reinstated. Plaintiff took actions which Finn recommended to his detriment.

      3.    APPLICABLE STANDARD

Summary Judgment Standard
*Johnson v. United States Postal Service*, 64 F.2d 233, 236 (6th Cir. 1995). The party seeking summary judgment has the initial burden of showing that there is no genuine issue as to any material fact. *Id.* We will reverse a grant of summary judgment if the nonmoving party has presented evidence of specific facts which, viewed in the most favorable light, indicates that there is a genuine issue for trial. *Id.* Summary judgment is appropriate "if the pleadings . . . and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). The court is not to weigh evidence in making this decision; summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Promissory Estoppel Standard

Under the doctrine of promissory estoppel in Massachusetts, "'[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1380 (1st Cir. 1991) (quoting *McAndrew v. School Comm.*, 480 N.E.2d 327, 332 (Mass. 1985)); see *Chedd-Angier Prod. Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, (1st Cir. 1985) (explaining that Massachusetts has adopted Restatement (Second) of Contracts § 90); see also *Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (indicating that in Pennsylvania, "[p]romissory estoppel allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, and (3) injustice can only be avoided by enforcing the promise"); *Murphy v. Burke*, 311 A.2d 904, 908 (Pa. 1973) (indicating that Pennsylvania's promissory estoppel doctrine follows Restatement (Second) of Contracts § 90). In Massachusetts, "'[a]n element of promissory estoppel is that the party invoking it must have reasonably relied on the alleged promise to his detriment.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1124 (1st Cir. 1995) (quoting *Hall v. Horizon House Microwave, Inc.*, 506 N.E.2d 178, 184 (Mass. App. Ct. 1987) (emphasis added in *Hall* )); see *Loranger Constr. Corp. v. E. F. Hauserman Co.*, 374 N.E.2d 306, 311 (Mass. App. Ct. 1978) (dictating that in the context of a promissory estoppel claim, "attention is to be focused upon the reasonableness of th[e] reliance"), aff'd, 384 N.E.2d 176 (Mass. 1978); see also *Josephs v. Pizza Hut of Am. Inc.*, 733 F.Supp. 222, 226 (W.D. Pa. 1989), aff'd, 899 F.2d 1217 (3d Cir. 1990). Courts typically invoke the doctrine of promissory estoppel when the formal requirements of contract formation are absent and when enforcing the promise would serve the interests of justice. See *Veranda Beach*, 936 F.2d at 1380; see also *Carlson*, 918 F.2d at 416.

To prove a claim of promissory estoppel under Massachusetts law, "a plaintiff must allege that (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." *Carroll v. Xerox Corp.*, 294 F.3d 231, 242 (1st Cir. 2002) (citing *Loranger Const. Corp. v. E. F. Hauserman Co.*, 374 N.E.2d 306, 308 (Mass. App. Ct. 1978)).

The traditional theory of promissory estoppel differentiates between a promise, an offer, and a bargain. See 3 Corbin, Corbin on Contracts § 8.9. Courts applying promissory estoppel doctrine sometimes confuse an offer with a

promise by requiring that a promise be "clear, definite and unambiguous." Id. Massachusetts courts, however, use the terms "promise" and "offer" interchangeably. See *R.I. Hosp. Trust Nat'l Bank v. Varadian*, 647 N.E.2d 1174, 1179 (Mass. 1995). As a result, "an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration." Id.

According to contract law, "[i]t is not required that all terms of [an] agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." *Situation Mgmt. Sys. v. Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000). The fact that "the parties may have chosen to leave one of the terms of the contract indefinite does not render it unenforceable." *Associated Credit Servs., Inc. v. City of Worcester*, 596 N.E.2d 388, 389 (Mass. 1992). These provisions of contract law apply equally to promissory estoppel, considering that in Massachusetts what is elsewhere called promissory estoppel is nothing but a contract absent consideration. See *Loranger Constr. Corp.*, 384 N.E.2d at 179.

Since a promise was made, we next must analyze if a promisor making such a promise should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and if the promise did induce such action or forbearance. See *Carroll*, 294 F.3d at 242.

Despite adopting what is commonly known as promissory estoppel as part of its jurisprudence, Massachusetts eschews the label "promissory estoppel." See *Loranger Constr. Corp. v. E. F. Hauserman Co.*, 384 N.E.2d 176, 179 (Mass. 1979) (holding that "[w]hen a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration.").

Promissory estoppel and negligent misrepresentation require the plaintiff to show that his reliance was reasonable. See *Trifiro v. New York Life Ins., Co.*, 845 F.2d 30, 33 (1st Cir. 1988) ("[I]f [plaintiff's] reliance is found unreasonable under the circumstances, . . . these claims must fail."); see also *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1124 (1st Cir. 1995) ("An element of promissory estoppel is that the party invoking it must have reasonably relied on the alleged promise to his detriment.") (emphasis in original) (internal quotation marks omitted).

A promissory estoppel cause of action demands a promise involving commitment, or the manifestation of an intention to act or refrain from acting in a specified way. *Rhode Island Hosp. Trust Nat. Bank v. Varadian*, 647 N.E.2d 1174, 1179 (Mass. 1995). See *Hall*, 506 N.E.2d at 184; see also *Santoni v. Federal Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir. 1982) (stating that the promise must be definite and certain so that the promisor should foresee that it would induce reliance by the promisee). Finn continually stated that if the conditions precedent were made, Plaintiff could be rehired.

The complaint's allegations, including the inferences favorable to the plaintiffs, see *Eyal v. Helen Bdcst. Corp.*, 411 Mass. 426, 429 (1991), citing *Nader v. Citron*, 372 Mass. 96, 98 (1977), accept as true all of the allegations of a complaint. See *Eyal v. Helen Bdcst. Corp.*, supra; *Berish v. Bornstein*, 437

Mass. 252, 267 (2002). With the allegations so viewed, "a complaint is sufficient against a motion to dismiss if it appears that the plaintiff may be entitled to any form of relief, even though the particular relief he has demanded and the theory on which he seems to rely may not be appropriate." *Nader v. Citron*, 372 Mass. at 104.

A complaint is sufficient if it "sketch[es] the bare silhouette of a cause of action." *Brum v. Dartmouth*, 44 Mass.App.Ct. 318, 322 (1998), S. C., 428 Mass. 684 (1999), quoting from *Coolidge Bank & Trust Co. v. First Ipswich Co.*, 9 Mass.App.Ct. 369, 371 (1980).

Statute of Limitations
The Defendants cite the Statute of Limitations as a defense.

The equitable doctrine of estoppel may be utilized to prevent a defendant from prevailing on a statute of limitations defense when the defendant's own conduct wrongfully lulled the plaintiff into foregoing legal action until it was too late. *Baglio v. New York Cent. RR Co.*, 344 Mass. 14, 19 (1962); *McLearn v. Hill*, 276 Mass. 519, 525 (1931). Equitable estoppel be predicated upon misrepresentations of past or present facts. Promissory estoppel may be based on misrepresentations of future facts. *Loranger Constr. Corp. v. E. F. Hauserman Co.*, 6 Mass. App. Ct. 152, 156 (1978), aff'd 376 Mass. 757, 761 (1978).

In *McLearn v. Hill*, the defendant was estopped from pleading the statute of limitations where the plaintiff had relied upon the defendant's implicit assurance that he would not assert that defense. See Dawson, Estoppel and Statutes of Limitation, 34 Mich. L. Rev. 1, 3 (1935).

A successful assertion of equitable estoppel requires: (1) "[a] representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made[;] (2) [a]n act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made[;] (3) [and d]etriment to such person as a consequence of the act or omission." *Cellucci v. Sun Oil Co.*, 2 Mass. App. Ct. 722, 728 (1974). Here, the Defendants actions induced the Plaintiff to take certain actions in order to be reinstated (hiring an attorney, enrolling in the EAP), induced Plaintiff to not take certain actions (filing a complaint with the Civil Service Commission, filing a complaint at an earlier date with MCAD), all to the Plaintiff's detriment.

4. PLAINTIFF FILED HIS DISCRIMINATION CLAIM WITH MCAD IN A TIMELY MANNER.

Complainants must file within the applicable 6 month statute of limitation at MCAD. Defendants (formerly Respondents) claim that the last act that could be considered as the triggering event was the letter from the Boston Fire Department dated April 19, 2002. Although this is one of the discriminatory events, it is not the final event. This event marks the FIRST of a pattern of events in which Finn encouraged Plaintiff to undertake actions described to ready him for reinstatement. These events ended only when Plaintiff realized that no matter what actions Plaintiff undertook, the Defendants would not reinstate him.

The final event was the letter dated April 2004, requesting reinstatement, which is well within the 6 month statute of limitation.

                                            Respectfully Submitted,
                                            Michael Hendricks,
                                            By his Attorney,

                                            Dana Johnson, Esq.
                                            P.O. Box 133
                                            Malden, MA 02148
                                            781-321-3762
                                            BBO #639119

September 13, 2006